IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

GERARD B. and MARGARET B.,           :
as Parents and Nearest Friends of    :
KELSEY B.,                           :
          Plaintiffs            :
                             :
                             :     CIVIL ACTION NO.  1:CV-01-1082
            v.            :
                             :     (Judge Kane)
                             :
CAMP HILL SCHOOL DISTRICT,           :
          Defendant             :


**MEMORANDUM AND DECISION**

I.    **Introduction**

      This case arises under the Individuals with Disabilities Education Act of 1997 ("IDEA"),

20 U.S.C. §§ 1400-1487 (2003), on appeal from a decision of the Special Education Due Process

Appeals Panel of the Commonwealth of Pennsylvania ("Appeals Panel").  The underlying action

was commenced on behalf of Kelsey B., a fourteen year old girl with learning disabilities, by her

parents, Gerard B. and Margaret B. ("Plaintiffs").  Plaintiffs claimed that Defendant, Camp Hill

School District, had not fulfilled its statutory obligations under the IDEA and that they should be

reimbursed for Kelsey's private school tuition and for the Independent Educational Evaluation

("IEE") that was completed in September of 2000.  The Hearing Officer found that the District

had failed to offer Kelsey a free appropriate public education and the parents were entitled to

reimbursement.  The Appeals Panel reversed that decision in its entirety, and Plaintiffs appealed to

this Court.

      Presently before the Court are cross-motions for summary judgment.  Both parties request

that if summary judgment is not granted, this Court make a decision on the administrative record. After review of the entire administrative record and applicable law, the Court makes the following decision on the issues presented. For the reasons that follow, the Court will reinstate the decision of the Hearing Officer and grant Plaintiffs the relief they seek.

## II.    Cross-Motions for Summary Judgment

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. A factual dispute is material if it might affect the outcome of the suit under the applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is genuine only if there is a sufficient evidentiary basis which would allow a reasonable fact-finder to return a verdict for the non-moving party. Id. at 249. The nonmoving party receives the benefit of all reasonable inferences. Sempier v. Johnson and Higgins, 45 F.3d 724, 727 (3d Cir. 1995).

Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations in the complaint. Instead, [it] must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden at trial." Id. at 322.

Cross-motions for summary judgment "are no more than a claim by each side that it alone

2

is entitled to summary judgment, and the making of such inherently contradictory claims does not

constitute an agreement that if one is rejected the other is necessarily justified or that the losing

party waives judicial consideration and determination whether genuine issues of material fact

exist." Transportes Ferreos de Venezuela II CA v. NKK Corp., 239 F.3d 555, 560 (3d Cir. 2001)

(citing Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir.1968)).  Thus, each moving party

"must still establish a lack of genuine issues of material fact and that it is entitled to judgment as a

matter of law." Joseph M.. v. Southeast Delco Sch. Dist.,  No. 99-4645, 2001 WL 283154, * 4

(E.D. Pa. Mar 19, 2001) (citations omitted).[1]

## III.    Discussion

Because the record is replete with disputes of material fact, this Court will decline to enter

summary judgment in either party's favor and will instead decide this case on the administrative

record.  In support thereof, the Court makes the following findings of fact and conclusions of law

pursuant to Federal Rule of Civil Procedure 52(a).

---

[1]There is some dispute as to whether summary judgment is the proper vehicle for an administrative appeal where no additional evidence is presented.  Compare Dong v. Bd. of Educ. of Rochester Cmty. Sch., 197 F.3d 793, 799 (6th Cir. 1999) (indicating that it is inappropriate to resolve IDEA appeals by reference to summary judgment principles) with Heather S. v. State of Wisconsin, 125 F.3d 1045, 1052 (7th Cir. 1997) (finding that in IDEA case where no new evidence is presented, "the motion for summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record.").  Because material disputes of fact would foreclose the grant of summary judgment here and since the parties have moved in the alternative for a decision on the administrative record, this Court will not decide this issue.

# FINDINGS OF FACT

*Background*

1.    Kelsey B. was born on November 20, 1988 and resides with her parents in the Camp Hill
      School District ("District").

2.    Kelsey is an exceptional student under the IDEA and entitled to the protections of the Act.
      Specifically, she has been diagnosed with a language-based learning disability and
      Occupational Defiance Disorder ("ODD").

3.    Kelsey began to show difficulties in reading and writing in the first grade.  When Kelsey
      was in second grade, the District offered her reading assistance pursuant to Title I of the
      Americans with Disabilities Act.

4.    Kelsey's parents obtained a private evaluation in June of 1997, when Kelsey was eight
      years old.  A psycho-educational evaluation was conducted by Nancy Patrick, M.Ed.,
      Ph.D. (Doc. No. 11, Def. Hearing Ex. A), and a psychiatric evaluation was done by John
      Biever, M.D. (Def. Hearing Ex. B).

      a.    Dr. Patrick used the following measures to evaluate Kelsey:  Wechsler Intelligence
            Scale for Children– Third Edition ("WISC-III"); Woodcock-Johnson:  Test of
            Achievement– Revised ("Woodcock-Johnson"); Bender Visual Motor Gestalt
            Test; Conners' Rating Scales, and parent and student interviews.  (Def. Hearing
            Ex. A).  The WISC-III revealed a verbal IQ of 104,[2] a performance IQ of 117, and
            a full scale IQ of 111.  The 13 point difference between the performance and

_____

[2]Kelsey's verbal IQ was prorated on four out of five subtests because the comprehension
subtest was invalidated as Kelsey refused to give answers.

verbal IQ scores indicates a discrepancy in Kelsey's learning capabilities. The Woodcock-Johnson revealed significant discrepancies from Kelsey's mental ability in the areas of letter-word identification, passage comprehension and in her broad reading score, which was in the twelfth percentile. Kelsey fell below her grade level in these areas as well as in dictation, where her standard score placed her in the twenty-third percentile. Kelsey's scores on all other subtests (calculation, applied problems, science, social studies, humanities) were all over the fiftieth percentile rank, within the average score range. Dr. Patrick noted that Kelsey's writing sample was shorter and less detailed that what she would expect given Kelsey's verbal descriptive capabilities and remarked that Kelsey's approach showed her to be a "creative child." Kelsey scored within the average range on the Bender Visual Motor Gestalt Test.

b.      Dr. Patrick concluded that a "significant discrepancy exists between Kelsey's Average mental ability and her Broad Reading score as measured by the [Woodcock-Johnson]." Dr. Patrick recommended the school consider Kelsey for specially designed instruction as a student with a developmental reading disability and for a behavior modification program.

c.      Dr. Biever diagnosed Kelsey with oppositional defiant disorder, a developmental reading disability, and a psychological stressor of "peer and teacher conflict secondary to difficult temperament." (Def. Hearing Ex. B). He recommended individual therapy, possible medication, and special remedial reading arrangements in school.

5.      In the fall of 1997, during Kelsey's third grade year, the District conducted a Multi-
        Disciplinary Evaluation ("MDE").  Kelsey was examined by Kerry Harbst, the District
        psychologist, who administered the Weshsler Individual Achievement Test ("WIAT").

6.      The MDE team produced a Comprehensive Evaluation Report ("CER") in December of
        1997.  The CER incorporates the findings of the MDE team as well as the Patrick
        evaluation, in-class observation, and teacher rating forms.  (Doc. No. 12 at Ex. 2, Pl.
        Hearing Ex. 4).

        a.      The WIAT showed Kelsey to be behind her grade level in nearly all of the testing
                areas, most notably in the reading and writing categories.  Kelsey scored an 84 on
                the reading composite, which corresponds to the 14th percentile and 2.1 grade
                equivalent.  On the writing composite, Kelsey scored a 79, which was the 7th
                percentile and 1.4 grade equivalent.  By contrast, Kelsey's language composite
                score was 112, which placed her in the 79th percentile and 5.0 grade equivalent.
                Id. at 3-4.  This shows a gap between Kelsey's performance and potential in
                language.

        b.      The CER noted that Kelsey is "creative, artistic, and loves to draw."  Id. at 5.  The
                CER indicated that Kelsey's IQ scores placed her in the "high average" range.  Id.
                at 3.  Reading, writing, and spelling skills were noted to be poor and the CER
                accordingly suggested basic reading skills and basic writing instruction.  It also
                recommended behavioral goals to the IEP team.  Id. at 4-5.

7.      No future IEPs or CERs utilized teacher rating forms, in-class observation, or WIAT
        results.

6

8.    An IEP was first developed for Kelsey in January 1998, mid-way through her third grade

year.  (Pl. Hearing Ex. 5).  The IEP lists Kelsey's two annual goals as:  "1.  Kelsey will

develop skills to become a more fluent reader, writer and speller.  2.  Kelsey will

demonstrate improved interpersonal skills, social responsibility, and classroom and school

behavior."  Id. at 2.  The IEP lists various instructional objectives and specially designed

instructions.

9.    Kelsey was given the Kaufman Test of Educational Achievement in January of 1998.  The

composite standard scores ("SS"), percentile ranks, and grade equivalents ("GE") are as

follows:  reading decoding SS=78, 7%, GE=1.8; reading comprehension SS=81, 10%,

GE=2.0; spelling SS=77, 6%, GE=1.9.  (Def. Hearing Ex. O).  These scores do not

demonstrate meaningful progress since the last round of standardized tests.  For example,

on the Woodcock-Johnson administered in June, 1997, Kelsey's passage comprehension

standard score was 83, which is the 13th percentile.  Her comprehension score thus

declined.

10.   Kelsey was again given the Kaufman test in April, 1998 as a predicate to a new IEP.

While the scores show improvement (reading decoding SS=87, 19%, GE=2.6; reading

comprehension SS=96, 39%, GE=3.5; spelling SS=83, 13%, GE=2.3) (Def. Hearing Ex.

O), the District admits that the test was improperly administered in that it was given too

soon after the previous test.  (Doc. No. 11, Notes of Hearing Transcript, Vol. I at 62-63).

Therefore, its use in assessing progress is minimal at best.

11.   The District developed a new IEP, dated May 21, 1998, for Kelsey's fourth grade school

year (1998-1999).  (Pl. Hearing Ex. 7).  The District lists the grade equivalents only for

the second Kaufman tests and asserts that the scores show improvements in the language

arts.  The goals and objectives are largely the same as those in the previous IEP.

12.    Kelsey was given the Stanford Achievement Test in April 1999. (Def. Hearing Ex. P). The

results show below average scores in nearly all areas of reading.  Kelsey's reading

vocabulary score placed her in the fifth percentile for children her age and her reading

comprehension score was in the 22nd percentile.  By contrast, Kelsey achieved average or

above average scores in math and science.  These test results were not reported in the next

IEP or considered in developing it.

13.    Another IEP was developed in May 1999 for Kelsey's fourth grade school year (1999-

2000).   This IEP reported grade equivalents only from the Kaufman spelling test,

Woodcock Reading Mastery test, and Woodcock-Johnson test, which were taken in April

and May of 1999, and concludes that "Kelsey's decoding skills, reading fluency,

comprehension, and writing skills have improved."  (Pl. Hearing Ex. 8 at 3).  The

summary section also states that "[b]ehaviorally, Kelsey has had a positive school year."

Id.

a.    Kelsey's standard score on the Kaufman spelling subtest was 80, which

corresponds to a ninth percentile rank and 2.9 grade equivalent.  (Def. Hearing Ex.

Q).  This is an increase from the January 1999 Kaufman spelling test, which

reported a 1.9 grade equivalent and from the May 1998 test, which reported a 2.3

grade equivalent.  The IEP reports that the scores indicate progress in all areas.

b.    The Woodcock Reading Mastery yielded the following grade equivalents:  word

identification 3.2; word attack 1.9; basic skills cluster 2.8; word comprehension

8

3.7; passage comprehension 3.0; and reading comprehension cluster 3.8. The

standard scores and percentile ranks were not reported on the IEP but are as

follows: word identification SS=79, 8%; word attack SS=77, 6%; word

comprehension SS=90, 25%; and passage comprehension SS=95, 37%. (Def.

Hearing Ex. DD).

    c.    The Woodcock-Johnson yielded the following results in the three subtests given:

dictation SS=88, 21%, GE=3.5; writing sample SS=102, 55%, GE=5.1; broad

writing SS=92, 30%, GE=3.9. (Def. Hearing Ex. R). Kelsey's dictation score is

lower than her June, 1997 score and her percentile dropped from 23rd to 21st over

23 months in learning support. Tom Haupt, the District psychologist who scored

the exam admitted to some discrepancies in scoring the writing sample[3] and the

dictation subtest.[4]

14. The May 1999 IEP identified largely the same needs as the May 1998 IEP. (Pl. Hearing

Ex. 8 at 3). Kelsey's reading goal and objectives were exactly the same as May 1998 IEP

except for an increase in her reading speed goal from 125 to 150 words per minute. Id. at

4. Likewise, Kelsey's writing goal and objectives were exactly the same as those in the

May 1998 IEP except that her benchmark increased from four details in a story to five and

---

[3]He could not explain why Kelsey got full credit on several sentences that appeared to be wrong. For example, Kelsey described a picture of a bird in a cage singing as "The bird is singg" and a picture of a horse and a cow as "The anemle is a caw" and received full credit for both sentences. (Pl. Hearing Ex. 1 at 25). The Hearing Officer noted that a raw score one point less than what Kelsey received would yield a grade equivalent of 4.4 and two points less would yield a grade equivalent of 3.9. (Doc. No. 1, Ex. B, Hearing Officer decision at 8).

[4]The basal and ceiling scores were not correctly identified. See Hearing Officer decision at 8 (citing Notes of Testimony, vol. IV at 441-42).

from two descriptive words to three.  Id. at 5.  Kelsey's spelling goal and objectives were exactly the same and include the same benchmarks, with the exception of the omitted objective of "memorize and apply six specific rules for spelling 90% of the time."  Id. at 4. The IEP does not indicate whether the previous academic goals were ever met.  Kelsey's behavior goal is the same on this IEP, however, some of the objectives and all of the benchmarks are new, and provide, among other things, that Kelsey will follow school and classroom rules 100% of the time and accept consequences for her actions 100% of the time.  It is not explained how these behavioral goals will be measured.

15.    At the May 1999 IEP Team meeting, Kelsey's parents expressed concerns as to what they perceived as lack of progress.  Specifically, they were concerned that Kelsey's reading level was so far behind her grade level and were worried that Kelsey's behavioral problems were being overlooked.

16.    The District offered emotional support for Kelsey in August 1999, at her parents' request. An Individualized Behavior Management Plan ("BMP") was added to the IEP in August of 1999.  The Plan re-stated the behavioral goals and objectives section and detailed how Kelsey's inappropriate behaviors would be dealt with, for example, by explaining "cueing" and "wait time."

17.    Kelsey's parents began to look for alternate educational placements for Kelsey in September of 1999.  Kelsey was accepted to The Janus School ("Janus"), but her parents declined to send her there and instead decided to give the District another chance to educate Kelsey.

18.    At the parents request, the District had Kelsey evaluated by a District psychiatrist, Shawn

10

Brent, M.D., on October 15, 1999.  The parents requested the evaluation to assess

whether Kelsey's current placement was appropriate.  (Def. Hearing Ex. J).  Dr. Brent

notes that Kelsey's academic struggles "were lessened slightly" when she started receiving

learning support services,  (Id. at 3), and that Kelsey's progress has been slow (Id. at 5).

However, she recommends that Kelsey continue receiving learning and emotional support

services at the District as she believed that her needs would be able to be met there.  Id. at

6.

19.     A  Functional Behavioral Assessment ("FBA") was performed in September and October

of 1999.  (Def. Hearing Ex. BB).  This included a social skills assessment, playground

observation, and teacher problem behavior assessments.  Kelsey's teachers noted work

refusals, verbal harassment of other students, transition difficulty, and disruptive behavior.

One teacher noted that 90% of the time, Kelsey's behavioral problems occured during

language arts instruction.  The answers on the behavior questionnaires shows that her IEP

behavioral goals were not being met, for example, the IEP mandate of 100% compliance

with school and classroom rules and accepting consequences 100% of the time.

20.     Kelsey was again given the Woodcock Reading Mastery test in November of 1999, six

months after she last took this test using the same form.  (Def. Hearing Exs. R & S).

These scores were not reported in the CER or later IEPs.  Kelsey's standard scores,

percentile ranks, and grade equivalents are as follows:  word identification SS=78, 7%,

GE=3.2; word comprehension SS=99, 47%, passage comprehension SS=98, 45%,

GE=4.5.  The word attack subtest, Kelsey's weakest area on the May 1999 test, was not

administered.  Kelsey's word identification scores decreased by one point.  Her passage

comprehension score increased by three points, an increase from the 37th to the 42nd percentile.

21.     The District produced another CER in November 1999, the purpose of which was to review Kelsey's academic and behavioral progress, conduct a Functional Behavioral Assessment ("FBA"), update the goals for Kelsey and determine her continued needs.  (Pl. Hearing Ex. 11 at 1).   The parental information section reports that the parents "continue to be concerned about Kelsey's academic and behavioral development" and "have expressed a desire to look into alternative educational placement options for Kelsey."  Id. The CER presents the history of Kelsey's problems and concludes that she made "vast" behavioral progress in third grade but had a "greater deal of difficulty improving her academic skills."  Id. at 2. It notes that during fourth grade Kelsey continued to progress behaviorally and that academically, Kelsey  "maintained satisfactory marks" and "showed some improvement in her achievement levels."  Id.  The team characterizes Kelsey's current progress half-way through fifth grade by reference to her grades, which were "satisfactory," and notes that she "works conscientiously" and that she has had "a lot of success" behaviorally.  The report does not address her current academic achievement levels and deficiencies.  Id. at 2-3.  The CER summarizes past standardized testing but does not include current tests as measures of progress or lack thereof.  The CER recommends continued placement at Kelsey's current school to address "significant lags she continues to demonstrate in reading and writing."  Id. at 6.  It further indicates that Kelsey's IEP should be updated to account for the present CER.  Kelsey's parents approved the CER "with reservations."  See id. at 9 (note in margins).

12

22.    Kelsey's final IEP was developed January 2000.  (Pl.  Hearing Ex. 14).  The summary of

performance section indicates that Kelsey has made "satisfactory" academic progress and

notes her present year grades rather than any test scores or objective measures as

achievement levels.  Id. at 8.  The needs section is taken directly from the CER and

likewise indicates that Kelsey has "significant academic lags" in basic reading, spelling and

writing skills.  Id. at 9.  Kelsey's reading goals, objectives and benchmarks are all exactly

the same as in the May 1999 IEP with the minor exception that the benchmark for

sounding out words was raised from 95% to 98% accuracy.  Id.  The spelling, writing, and

behavioral goals, objectives, and benchmarks are all identical to those in Kelsey's previous

IEP, as is the BMP.  Id. at 10-11;14-15.  The IEP does not indicate whether the previous

goals were met, although since they remained the same, it can be assumed that they were

not met.  The specially designed instructions are all identical to the previous IEPs, with

two minor additions for science and social studies, areas which were not previously

covered by Kelsey's IEPs.  Everything else in the January 2000 IEP appears to be identical

to the previous IEP. Kelsey's parents approved the IEP, again, with reservations.

23.    Kelsey's behavioral troubles intensified during her fifth grade year, at least in part due to

her academic frustrations.  This was manifested in work refusals, rapidly declining grades,

and five disciplinary actions including detention and in-school suspension.  (Pl. Hearing

Ex. 15, Def. Hearing Ex. AA).  Finally, Kelsey's situation culminated in an "emotional

breakdown" in May 2000.  (Pl. Br. at 3).

24.    In March, 2000, Kelsey's teachers filled out information forms for a summer camp

program.  (Pl. Hearing Ex. 16).  The forms indicated that Kelsey has few positive peer

relationships, is bossy and power-oriented, is uncompromising, has difficulty in transitions and deals with frustration by refusing to work, shutting down, and lashing out.  The teachers also indicate that wait time, verbal praise, and redirection are effective in managing her behavior.  Id.

25.  Kelsey's parents sent Kelsey to Jeanette Morales-Brand, M.D. for another psychiatric evaluation in May 2000 due to mounting concerns about her emotional health. (See Pl. Br. at 3; Pl. Hearing Ex. 20 at 1).  Dr. Morales-Brand noted that some of Kelsey's depression was due to "her lack of perceived success in the school environment.  She continues to struggle in the reading and spelling domain which is so critical to her feelings of academic competence."  (Pl. Hearing Ex. 20 at 4).  Dr. Morales-Brand recommended continued learning and emotional support services, including "specific and aggressive intervention of her reading difficulties . . . ."  Id. at 5.  Because of Kelsey's difficulties with her peers, Dr. Morales-Brand recommended that Kelsey be in an educational environment "where she does not have the preexisting conflicts that she has had with her peers" in the past.  Id. Consequently, under non-educational recommendations, Dr. Morales-Brand suggested an outpatient treatment program at Pinnacle Health for the remainder of Kelsey's fifth grade year and placement at Janus for her sixth grade year.  Id. at 5-6.

26.  Following this recommendation, Kelsey attended the Pinnacle Health outpatient behavioral program from May 26, 2000 to June 13, 2000.  (Pl.  Hearing Ex. 12 at 1).

27.  The IEP was updated on May 26, 2000 to add transportation services.  (Pl. Hearing Ex. 14 at 11 & 13).  The District agreed to provide Kelsey transportation to and from Pinnacle Health's partial hospitalization program.  Id. at 11.

28.  For Kelsey's sixth grade year, her parents placed her at Janus and had her educational status re-evaluated by Alan Babcock.

29.  Sometime before August 11, 2000, the parents notified the District of their decision.  In response, the District sent Kelsey's parents a notice of recommended assignment which refused their request to reevaluate Kelsey's placement and offered the same IEP from January 2000 for the upcoming school year.  (Pl. Hearing Ex. 14).

***Procedural History***

30.  In August of 2000, Kelsey's parents initiated a due process hearing against the District, seeking reimbursement for their unilateral placement of Kelsey at Janus and the evaluation of Kelsey by Alan Babcock

31.  The Special Education Hearing Officer, Karl A. Romberger ("Hearing Officer")  held closed hearings on October 10, October 24 and December 1, 2000 and January 9 and January 12, 2001.  (Doc. No. 1, Ex. B (hereinafter referred to as "Hearing Officer decision")).

32.  The Hearing Officer issued a decision on February 26, 2001, concluding that the District's IEP offered for the 2000-2001 school year did not offer Kelsey a free appropriate public education.  The Hearing Officer further concluded that Janus was an appropriate placement and the parents should be reimbursed for the tuition as well as for the Babcock IEE.  Id.

33.  The District filed exceptions to the Hearing Officer's decision on March 13, 2001, to which Plaintiffs responded.

34.  On April 20, 2001 the Appeals Panel issued their decision, reversing the Hearing Officer's

decision in its entirety.  The Appeals Panel concluded that the District offered Kelsey a free appropriate public education with the January 2000 IEP so reimbursement for the private placement and IEE was inappropriate.  The Panel further concluded that regardless,  Janus was not an appropriate placement for Kelsey, and the Babcock evaluation did not meet the standard for reimbursement because it provided no new useful information.  (Doc. No. 1, Ex. A (hereinafter referred to as "Panel decision")).

35.    Plaintiffs filed this appeal as a result of the Appeals Panel decision.  (Doc. No. 1).

36.    Plaintiffs and Defendant filed cross-motions for summary judgment or in the alternative, motions for disposition on the administrative record.  (Doc. Nos. 12 & 13).

***Babcock Evaluation***

37.    Alan Babcock performed a psycho-educational evaluation of Kelsey on September 14, 16, and 29, 2000.  Her parents had referred her to the evaluation due to concerns about her academic progress, her communication skills, her low self-esteem, and her behavioral issues.  (Pl. Hearing Ex. 18 at 1).  The evaluation addressed Kelsey's intelligence, factors contributing to Kelsey's presenting problems, and educational programs that would prove beneficial for Kelsey.  Id.

38.    Along with reviewing previous reports and evaluations, Mr. Babcock administered the WISC-III, the WIAT, the California Verbal Learning Test for Children, the Rey Complex Figure Test, and the Test of Auditory Discrimination.  (Pl. Hearing Ex. 18).  He also sent Kelsey's teachers questionnaires, which they declined to complete.

a.     On the WISC-III, Kelsey received a verbal IQ of 99[5], a performance IQ of 123, and a full scale IQ of 111.  Mr. Babcock analyzed Kelsey's performance on the Perceptual Organization Index, which was in the superior range and her performance on the Verbal Comprehension Index, which was in the average range and concluded that the difference between these scores was very significant and demonstrated inconsistent learning skills.  Id. at 2.  On the Freedom from Distractibility Index, Kelsey performed in the low average range, scoring in the tenth percentile.  The index measures verbal working memory, and such a low score reveals a very weak verbal working memory.  Id.  The large discrepancy between this score and the Perceptual Organization, where Kelsey scored in the 98th percentile, indicate that Kelsey has skills but is unable to access them, which then causes great difficulty.  (Hearing Officer decision at 20, citing N.T. vol. III at 304).

b.     Kelsey's WIAT scores did not show progress from the last test.  The subtests most notably yielded the following results:  Basic Reading SS=81, 10%, spelling SS=71, 3%, reading comprehension SS=84, 14%, written expression SS=76, 5%.   These scores all place Kelsey below her grade level and at a level further behind than she was in June 1997.  By contrast, she received standard scores of 104 and 106 on the listening comprehension and oral expression subtests respectively, which are

---

[5]This IQ score was based on scores on all subtests, in contrast to the June 1997 score, which may account for the discrepancy.  The subtest that was previously invalidated, comprehension, was one of Kelsey's lowest scores.  (Compare Pl. Hearing Ex. 18 at 11 with Def. Hearing Ex. A at 4).

above the fiftieth percentile rank.  Kelsey's composite scores likewise show a decline from her 1997 scores in reading and writing.  Her reading composite standard score decreased from 84 to 78, placing her in the 7th percentile for children her age.  Likewise, her writing composite score decreased from 79 to 69, which corresponds to the 2nd percentile.  Kelsey's math and language scores were roughly the same and within the average range.  (Pl. Hearing Ex. 18 at 13).

39.  Consistent with these test results, Mr. Babcock identified a decline in scores and lack of progress in reading and writing.  He noted that she is "struggling tremendously" with reading and writing and is strong in the areas that don't require these skills, such as expressive language, listening, and speaking.  (Hearing Officer decision at ¶ 36(d), citing N.T. Vol. III at 309-10 & 351).  He noted that Kelsey's discrepancy between her ability and achievement in reading and writing is statistically significant and infrequent, occurring in less than 1% of the population.  (Pl. Hearing Ex. 18).

40.  The six factors that Mr. Babcock identified as contributing to Kelsey's problems were: (1) her superior nonverbal ability, which can interfere with her peer relationships and her classroom attentiveness since she wants to do things her own way, "focus on things that she wants to do and ignore activities that are difficult for her."  Furthermore, because her "thinking skills are beyond what is being taught in the classroom," she is not always interested in the curriculum.  (2) Her language-based learning disability, which is manifested in her severe discrepancy between achievement and intellectual ability.  Kelsey can understand language concepts but has difficulty processing language, which interferes with her academic performance as well as her social interactions and problem solving

skills.  (3) Her neurobehavioral disorders, as per her previous diagnoses, displayed

symptoms, and symptoms described by her parents.  The disorders include depressive

disorder, disruptive behavior disorder, ODD, and Attention Deficit Hyperactivity

Disorder.  (4) Her negative feelings in response to her difficulties, which she is aware of

but does not understand, resulting in anxiety, depression, and anger.  (5) Her lack of

coping skills, including the inability to apply inductive reasoning to complex situations and

persistent feelings of inadequacy, which Babcock attributes to her learning disability.  (6)

environmental factors which may contribute to her difficulties.  (Pl. Hearing Ex. 18 at 3-

8).

41.    Mr. Babcock emphasized that anyone dealing with Kelsey, including her parents and

teachers, should understand these factors in order to respond to her and educate her

effectively.  Id.

42.    Mr. Babcock made extensive recommendations for school and home, which will not be

summarized here.  Id. at 15-47.  He recommends a different reading program as it was

apparent that Kelsey was not benefitting from the program the District had been using.

He concludes that Janus would be an appropriate placement for Kelsey.  (Id. at 8-10 and

N.T. Vol. III at 365-66).


***The Janus School***[6]

43.    The Janus School is a nonprofit private day school licensed by the Commonwealth in the

---

[6]These findings are adopted from the Hearing Officer's decision at ¶¶ 40-45.  The Court
has reviewed the relevant portions of the notes of testimony and concludes that these findings
regarding Janus are appropriate for its purposes.

areas of elementary and secondary special education, tutoring, educational testing, and

remedial reading.  (N.T. vol. IV at 486).   Janus is not licensed for emotional support.

(N.T. vol. III at 367).  Janus has an instructional ratio of about one-to-three and academic

class sizes ranging from four to ten students.  (N.T. vol. IV at 486).  Every student at

Janus is diagnosed with a specific learning disability.  Id. at 486.  Every student is assigned

a tutorial teacher and receives at least 30 minutes of one-on-one instruction daily focusing

mainly on remedial skills.  Id. at 488.  Every student also takes a study skills class to

address organization, study strategies, memorization techniques, homework, and

individual concerns.  Id. at 490.  Every student also takes social communication class

which addresses, among others, interpersonal interactions and conflicts.  Id.  The students

in Kelsey's regular classes are all within about one year of age and the same basic ability

level.  Id. at 497.

44.    Kelsey's reading tutor at Janus, Joy Jones, opined that after she began working with

Kelsey, there was a need for intense phonics and phonemic awareness insturction.  Id. at

516.  Kelsey's reading strategy at that point in time was to just skip a work if she did not

know it.  Id. at 517.  Kelsey would substitute familiar words for unfamiliar words, insert

syllables or letters, invert endings and beginnings of works, did not know all her vowel

sounds and sound blends with certainty, and was not proficient at syllabication.  Id. at

517-18.  See also id. at 532 (relating similar facts from content area teacher).[7]  Kelsey's

content area teacher, Patricia Lorraine, estimated Kelsey's reading grade equivalent at

---

[7]Kelsey's initial tutorial report, dated October 2, 2000, states that during a test of oral reading, the test administrator noted that Kelsey read the passages very quickly, though not accurately.

probably third grade when she started the school year <u>Id.</u> at 533.  Jones has not had any

formal instruction in phonetic techniques such as Wilson, Distar, or Orton-Gillingham.  <u>Id.</u>

at 527.

45.    Kelsey receives 30 minute daily instruction in art and her "interest in art is apparent."  (Pl.

Hearing Ex. 19 at 12).

46.    Many of Babcock's recommendations have been implemented by Janus.  (N.T. vol. IV at

498).

47.    Kelsey transitioned well to Janus with minimal behavioral problems.  <u>Id.</u> at 500.  Kelsey

has not presented emotional/behavioral needs greater than Janus can meet.  <u>Id.</u> at 542.  If

she presented emotional need greater than Janus could handle, the parents would be asked

to seek a more appropriate placement.  <u>Id.</u> at 510.  The parents continue to provide

private counseling for Kelsey.  (N.T. vol. V at 668-69).

48.    Tuition at Janus is $20,620 and transportation costs are $179 per month.  <u>Id.</u> at 644-45.

<u>**CONCLUSIONS OF LAW**</u>

<u>**Legal Framework and Standard of Review**</u>

Parents may initiate an impartial due process hearing to challenge their child's evaluation, placement, or the provision of free appropriate public education.  20 U.S.C. § 1415(f).  In Pennsylvania, which has a two-tier review system, this review is conducted by the local education agency.  22 Pa. Code § 14.162.   The decision of the Hearing Officer can be reviewed independently at the state educational agency level.  20 U.S.C. § 1415(g); 22 Pa. Code § 14.162. The party aggrieved by the administrative decision has a right to bring a civil action in state or federal court.  20 U.S.C. § 1415(i)(2)(A).  This Court has jurisdiction of such actions "without regard to the amount in controversy."  20 U.S.C. § 1415(i)(3)(A).

In actions brought under the IDEA, "the court-- (i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  <u>Id.</u> at § 1415(i)(2)(B).  Here, the parties have elected not to submit additional evidence.  In order to prevent district courts from imposing their own views of preferable educational methods on the states given this broad scope of review under the statute, the Supreme Court has held that courts must give "due weight" to the administrative proceedings. <u>Rowley</u>, 458 U.S. at 205-06.  The amount of deference to accord the administrative proceedings is left in the court's discretion, and it "must consider the administrative findings of fact, but is free to accept or reject them."  <u>Oberti v. Bd. of Educ. of Borough of Clementon Sch. Dist.</u>, 995 F.2d 1204, 1219 (3d Cir. 1993).

In two-tier systems, the Appeals Panel exercises plenary review over the Hearing Officer

except that it should accord the Officer deference on credibility judgments "unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion." Carlisle Area Sch. v. Scott P., 62 F.3d 520, 529 (3d Cir. 1995). The district court should give "due weight" to the Appeals Panel over the Hearing Officer, and when a Panel reverses an Officer, the court should give "due weight" to the Panel's reversal of "conclusions of law, inferences from proven facts, and factual findings based on credibility judgments where non-testimonial, extrinsic evidence justified the panel's contrary decision." Id.; see also id. at 529, n.4 (assuming that a court should give "less consideration to an appeals panel ruling that disregards a hearing officer's credibility judgments where this standard is not met"). If the district court departs from the agency's ruling, it should give reasons for the departure. Id. at 527.

Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs[.]" 20 U.S.C. § 1400(d)(1)(A). The Act defines free appropriate public education (sometimes referred to as "FAPE") as:

> special education and related services that--
> (A) have been provided at public expense, under public supervision and direction, and without charge;
> (B) meet the standards of the State educational agency;
> (C) include an appropriate preschool, elementary, or secondary school education in the State involved; and
> (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(8). Drawing from this statutory definition and the definitions of "special

education"[8] and "related services,"[9] the Supreme Court noted that "a 'free appropriate public education' consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction."  Bd. of Educ. v. Rowley, 458 U.S. 176, 188-89 (1982).  The Rowley Court concluded that "the 'basic floor of opportunity' provided by the Act consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child."  Id. at 202.  The Court of Appeals for the Third Circuit interpreted Rowley to hold that the IDEA calls for more than a trivial or de minimis educational benefit and in fact, "that Congress intended to afford children with special needs an education that would confer meaningful benefit."  Polk v. Central Susquehanna Intermediate Unit, 16 853 F.2d 171, 180 (3d Cir. 1988).  The Circuit Court went on to hold that "the question whether benefit is de minimis must be gauged in relation to the child's potential."  Id. at 185.  The Circuit Court similarly held that a district court must consider the child's intellectual potential in analyzing FAPE and reversed a district court decision which did not give this factor adequate consideration and did not apply a high enough educational standard.  Ridgewood Bd. of Educ. v. N.E., 172 F.3d 238, 247-48 (3d Cir. 1999).

---

[8]The Act defines special education as "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability, including-- (A) instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and (B) instruction in physical education."  20 U.S.C. § 1401(25)

[9]The Act defines related services as "transportation, and such developmental, corrective, and other supportive services . . . as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children."  20 U.S.C. § 1401(22).  The statute also includes several examples of services, such as audiology services and psychological services.  Id.

The primary mechanism for delivering free appropriate public education is the individualized education program ("IEP").  20 U.S.C. §§ 1401(11) & 1414(d)(1)(A); Polk, 853 F.2d at 173.  "The IEP consists of a detailed written statement arrived at by a multi-disciplinary team summarizing the child's abilities, outlining the goals for the child's education and specifying the services the child will receive." Polk, 853 F.2d at 173.  The IEP must include, among other things, a statement of the child's current level of educational performance, annual goals for the child, measurable intermediate steps or major milestones to monitor progress, specific educational services to be provided, and a statement of the extent to which the child will participate in regular educational programs.  34 C.F.R. § 300.347; see also 34 C.F.R. § 300, App. A (Notice of Interpretation).  The Act imposes numerous procedural safeguards to ensure proper development of the IEP and to protect the rights of parents and guardians to challenge the IEP.  See Rowley, 458 U.S. at 205-07.

In conducting a review of state IDEA proceedings, the Court must first ask whether the state complied with the procedural requirements of the IDEA and second, it must ask whether the state's determinations are "reasonably calculated" to enable the child to receive meaningful educational benefits.  Rowley, 458 U.S. at 206-07; Fuhrmann v. East Hanover Bd. of Educ., 993 F.2d 1031, 1035 (3d Cir. 1993).

**Procedural Claims**

Plaintiffs make several allegations of procedural problems in developing Kelsey's IEPs.  First they assert that Kelsey's first IEP (January 1998) included only raw data without any explanation.  (Doc. No. 12, Motion at 10, ¶ 32(a)).  They also assert that the May 1998 and May 1999 IEPs "failed to provide for objective evaluation procedures[.]"  Id. at ¶ 32(b).  The January

2000 IEP, Plaintiffs allege, was not well defined as to Kelsey's performance and needs, and contained no objective evaluation procedures.  Id. at ¶ 32(c).  The Appeals Panel concluded that the "[t]here was no technical flaw, nor any procedural error in any IEP offered" to Kelsey.  (Panel decision at 5).

The IDEA and accompanying regulations contain detailed provisions for the evaluation of disabled children and development of IEPs.  20 U.S.C. § 1414; 34 C.F.R. §§ 300.340-300.350; see also 20 U.S.C. § 1415 (procedural safeguards).  The school district is required to assess the child "in all areas of suspected disability."  20 U.S.C. § 1414(b)(3)(C).  In reevaluating the child, the IEP team is to review all existing evaluation data, including "current classroom-based assessments and observations," and information provided by the parents.  § 1414(c)(1).  From this review, the IEP team is supposed to identify what additional data are need to determine, among other things, "the present levels of performance and educational needs of the child;" and "whether any additions or modifications to the special education and related services are needed to enable the child to meet the measurable annual goals set out in the [IEP] of the child . . . ." § 1414(c)(1)(ii) and (iv).  The IEP is to be reviewed not less than annually and revised "as appropriate" to address:  "(i) Any lack of expected progress toward the annual goals . . . and in the general curriculum, if appropriate; (ii) The results of any reevaluation . . . (iii) Information about the child provided to, or by, the parents . . . ."  34 C.F.R. § 300.343(c)(2)(i)-(iii).

This Court must ask:  "has the State complied with the procedures set forth in the Act?" Rowley, 458 U.S. at 206.  The only claims now before the Court involve the January 2000 IEP, and the most serious allegations of procedural violations arise under this IEP.  In the District's reevaluation of Kelsey in Fall 1999, they did not assess all her trouble areas, nor did they

26

conduct classroom observations or draw upon the information provided to them by the parents. The District did not determine what data was lacking to determine Kelsey's educational needs and necessary modifications to her IEP. The District failed to administer tests consistently and properly and did not report fully or adequately the results of the reevaluation. Thus, contrary to the Appeals Panel's finding, the preponderance of the evidence demonstrates that the District failed to comply in material respects with the procedural requirements of the IDEA. This resulted in substantive failings in the content of the January 2000 IEP, including failure to revise the IEP to address Kelsey's lack of progress under the past nearly identical IEPs and failure of the IEP to contain any objective measures of Kelsey's then-current educational level and to ask or answer whether her educational goals were being met.

The question now becomes whether these failings resulted in a denial of a free appropriate public education. See, e.g., Murphy v. Timberlane Reg'l Sch. Dist., 22 F.3d 1186, 1196 (1st Cir. 1994) (holding that "not every procedural irregularity gives rise to liability under the IDEA but such claims are successful where procedural failures which have "compromised the pupil's right to an appropriate education . . . or caused a deprivation of educational benefits"); Coale v. State Dept. of Educ., 162 F. Supp. 2d 316, 333-335 (D. Del. 2001) (finding that IEP did not comply with the IDEA's procedural requirements but that this did not rise to the level of a violation because it did not result in a denial of FAPE). Because this question is so intertwined with the substantive claims and because some of the procedural claims are also related to the substance of the IEP, it will be addressed below in the context of the substantive claims.

## **Substantive Claims**

Plaintiffs make several claims in this appeal. First, they assert that the Appeals Panel

applied the wrong standard for free appropriate public education, which was an error of law. Second, they argue that the Panel committed an error of law by declining to defer to the Hearing Officer's credibility determinations and neglecting to review documentary evidence or providing explanations for their departure. Third, Plaintiffs argue that the Panel utilized the wrong legal standard for determining whether the private placement was appropriate. Fourth, Plaintiffs claim that the Panel's findings of fact regarding the appropriateness of Kelsey's IEP were clearly erroneous. Similarly, they claim that it was clearly erroneous for the Panel to find that the IEE was inappropriate.

Parents who are dissatisfied with their child's IEP may, "unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials, [but] do so at their own financial risk." Sch. Comm. of Town of Burlington v. Dep't of Educ. of Mass., 471 U.S. 359, 373-74 (1985). They may then be entitled to reimbursement if "a federal court concludes both that the public placement violated IDEA and that the private school placement was proper under the Act." Florence County Sch. Dist. Four v. Carter, 510 U.S. 7, 15 (1993); see also 20 U.S.C. § 1412(a)(10)(C)(ii).

Although the District prevailed at the Appeals Panel level, the burden remains with it to prove that the IEP it offered is appropriate. Oberti v. Bd. of Educ. of Borough of Clementon Sch. Dist., 995 F.2d 1204, 1218-21 (3d Cir. 1993). If it fails to meet this burden, the parents bear the burden of proving that Kelsey's private placement was appropriate. Carlisle Area Sch. v. Scott P., 62 F.3d 520, 533 (3d Cir. 1995). In determining whether to award tuition reimbursement and transportation costs, equitable considerations are relevant. Burlington, 471 U.S. at 374; see also 20 U.S.C. § 1412(a)(10)(C)(iii) (allowing an agency or court to reduce or

28

deny the amount of reimbursement under certain circumstances). A court may award reimbursement even if the private school does not meet the IDEA's free appropriate public education requirements. Carter, 510 U.S. at 13. Once the court has determined that a school district has violated the IDEA, it has "broad discretion" to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B)(3); Carter, 510 U.S. at 15-16.

A.    *Appropriateness Public Education Offered*

The Court will first turn to the issue of whether the District offered Kelsey a free appropriate public education with the IEP it developed for her sixth grade school year (2000-2001).[10] The Appeals panel, when considering this issue, concluded that although the District conceded that in developing the January 2000 IEP, they "didn't look at [the goals] in as much detail as we should have," the District "offered Kelsey a basic floor of opportunity– no more, no less." (Panel decision at 4) (alteration in original). Plaintiffs challenge the FAPE standard used by the Panel, arguing that it failed to analyze whether the IEP provided significant learning and a meaningful educational benefit, and in essence applied the "de minimis" educational standard rejected by the Third Circuit in Polk. 853 F.2d 171 (3d Cir. 1988).

As discussed above, the District must prove that it offered Kelsey a free appropriate public education, specifically that her IEP was reasonably calculated to provide a meaningful educational benefit at the time it was offered. Fuhrmann v. East Hanover Bd. of Educ., 993 F.2d 1031 (3d

---

[10]The Panel and Defendant both emphasize the fact that Kelsey's parents never objected to the IEPs offered by the District. (Def. Br. at 13, Panel decision at 5). While this is not entirely an accurate representation since the parents did continually express concerns about Kelsey's lack of progress and approved the IEP at issue here only "with reservations," their failure to object does not foreclose their right to reimbursement. Warren G. v. Cumberland County Sch. Dist., 190 F.3d 80, 87 (3d Cir. 1999).

Cir. 1993).  While the Appeals Panel cited this language, it does not appear to have properly

applied it.  In rejecting the Hearing Officer's detailed findings and credibility determinations, the

Panel, in a conclusory fashion, found simply that although the IEP was "skeletal and uninspired, it

was reasonably calculated to provide meaningful educational benefit at the time it was offered."

(Panel decision at 4-5).  The Panel further concluded without explanation that "Kelsey does

appear to have made meaningful progress."  (Panel decision at 5, citing Def. Hearing Exs. S-X).

This is perhaps an attempt to apply the proper FAPE standard, but the Panel did not point to

more specific examples of progress or how it was measured and accounted for in the IEP.  IDEA

compliance should be assessed by utilizing a student-by-student analysis which considers the

potential of the individual disabled student.  Rowley, 458 U.S. at 202.  No such analysis occurred

here.

        The Panel, rather than delving into the intricacies of the educational and psychological

assessments, simply credited the testimony of Kelsey's teachers in concluding that "there was no

reason to disbelieve the teachers and administrators, who testified that she was making some

progress, though perhaps not as much as the parents would have hoped."  (Panel decision at 5).

The Panel further notes the testimony that Kelsey had made behavioral progress as well.  The

Hearing Officer had explained that Kelsey's teachers assertions of progress were inconsistent and

unconvincing.  (Hearing Officer decision at 29).   The Officer pointed to inconsistencies in the

teachers' testimony in reference to Kelsey's behavioral and emotional progress.  Id. at 33.  The

Panel seemed to entirely ignore this adverse credibility determination without justification and

failed to point to documentary evidence compelling the opposite conclusion.  Accordingly, this

Court is not required to give weight to this conclusion.  See Scott P., 62 F.3d at 529.

The findings of the Appeals Panel are woefully inadequate under the standards for review in these important cases.  This Court concludes that the Appeals Panel committed error in failing to consider Kelsey's potential when assessing her IEP and failing to analyze in detail whether the IEP offered her a meaningful educational benefit.  Therefore, this Court rejects the Panel decision regarding the appropriateness of the public education offered by the District.  This Court must now consider whether the January 2000 IEP was reasonably calculated to offer Kelsey meaningful educational benefits when taking into account Kelsey's intellectual potential and her progress or lack of progress under previous IEPs.

The educational benefit offered in the IEP "must be must be gauged in relation to the child's potential."  Polk, 853 F.3d at 185.  For example, "[w]hen students display considerable intellectual potential, [the] IDEA requires a great deal more than a negligible benefit."  Ridgewood, 172 F.3d at 247.  Furthermore, the IDEA "requires a plan of instruction under which educational progress is likely."  Bd. of Educ. of E. Windsor Reg'l Sch. Dist. v. Diamond, 808 F.2d 987, 991 (3d Cir. 1986) (citing Rowley).  As early as her first evaluation by the District, it was known that there was a significant gap between Kelsey's intellectual potential and her performance.  She has a high average IQ as measured by the WISC-III.  She has very good nonverbal language capabilities and is creative and artistic.  However, her performance in reading and writing based exams and curriculum is dismal. There is no evidence that shows this gap or Kelsey's potential was addressed in the IEP at issue.

Much of the dispute between the parties centers on the issue of whether or not Kelsey made progress under past and current IEPs.  It is worth noting that "the measure and adequacy of an IEP can only be determined as of the time it is offered to the student, and not at some later

31

date." Fuhrmann, 993 F.2d at 1040. Therefore, "evidence of a student's later educational progress may only be considered in determining whether the original IEP was reasonably calculated to afford some educational benefit." Id. However, the Third Circuit has noted that "if a student had failed to make any progress under an IEP in one year, we would be hard pressed to understand how the subsequent year's IEP, if simply a copy of that which failed to produce any gains in a prior year, could be appropriate." Scott P., 62 F.3d at 534. Since Kelsey's IEPs remained essentially the same for the duration of her time in special education at the District, consideration as to whether she made progress under them is therefore important to evaluating whether the current IEP was appropriate at the time it was offered and whether it was a plan where "educational progress [was] likely." See Diamond, 808 F.2d at 991.

The evidence shows that nearly three years after her first evaluation, the gap between Kelsey's potential and her performance had not narrowed significantly, yet her IEP remained largely the same year after year, even after the reevaluation process. In fact, according to the results of the Babcock evaluation, the educational gap had widened in all areas of her disability. It is difficult to measure Kelsey's progress simply by reference to her IEPs since the District failed to consistently evaluate Kelsey in all areas of her disability, improperly administered some of the tests, and neglected to report detailed results including percentile ranks on the IEPs, and in the IEP at issue measured her academic standing only by reference to her current grades. For example, in the one area that was somewhat consistently tested, spelling, Kelsey was given the Kaufman spelling test three times, in January of 1998, April of 1998 and April and May of 1999. Over this time, her standard score fluctuated from 77 (6th percentile) to 83 (13th percentile) to 80 (9th percentile) and her grade equivalents raised slowly from 1.9 to 2.3 to 2.9. Even with the

"practice effect" with the tests being administered so close together, Kelsey's score went up only three points over a year and a half, or from the sixth percentile to the tenth percentile, and her grade equivalent rose at a rate slower than the passage of time. Therefore, Kelsey's progress in spelling was minimal at best and she made less than a year and a half's progress in that amount of time, leaving her even further behind her peers.[11] Similarly, on the Woodcock Reading Mastery word identification subtest, Kelsey's standard score decreased from 79 to 78 between the May and November 1999 tests. This indicates that Kelsey regressed in this area as well.

The records of standardized tests discussed more fully in the findings of fact demonstrate repeatedly that Kelsey was not progressing at an acceptable level under the District's IEPs. This is somewhat difficult to measure since the IEPs' objective measurable goals are vague and there was no assessment as to whether these were being met. However, a good objective measure of progress is the results of the WIAT administered by Mr. Babcock in September 2000, nearly three years after the District gave her the test. The results were enlightening, showing considerable regression in reading and writing along with a continued significant differential between intellectual potential and performance. The following chart illustrates the difference in standard

---

[11]Progress is better looked at in reference to the standard scores. The standard score represents a bell curve where the fiftieth percentile is a 100 score which remains constant. What looks like progress under the grade equivalents can therefore be misleading when compared to the percentiles. The following is a fictitious example to illustrate this principle. In third grade the average number of push ups done by students is 10 and in fourth grade the average increases to 12. Sam could do 7 push ups in third grade and 8 push ups in fourth grade. He has progressed in terms of the number of push ups he can do and therefore his grade equivalent would have advanced, but Sam has not really progressed, but has actually regressed and falls further behind his peers. The standard scores demonstrate this, as his percentile rank has dropped from 16th to 9th. Example borrowed from Peter Wright & Pamela Wright, Tests and Measurements for the Parent, Teacher, Advocate & Attorney (2001), available at http://www.wrightslaw.com/advoc/articles/tests_measurementspf.html.

scores and percentile ranks between the two administrations of the WIAT.

|  | June 1997 | | Sept. 2000 | | Difference | | Gap |
|---|---|---|---|---|---|---|---|
| Reading Composite | 84 | 14% | 78 | 7% | 6 | 7% | 43% |
| Basic Reading | 82 | 12% | 81 | 10% | 1 | 2% | 40% |
| Reading Comprehension | 89 | 23% | 84 | 14% | 5 | 9% | 36% |
| Mathematics Composite | 95 | 37% | 94 | 34% | 1 | 3% | 16% |
| Mathematics Reasoning | 91 | 27% | 95 | 37% | +4 | +10% | 13% |
| Numerical Operations | 99 | 47% | 95 | 37% | 4 | 10% | 13% |
| Writing Composite | 79 | 8% | 69 | 2% | 10 | 6% | 48% |
| Spelling | 83 | 13% | 71 | 3% | 12 | 10% | 47% |
| Written Expression | 81 | 10% | 76 | 5% | 7 | 5% | 45% |
| Language Composite | 112 | 79% | 106 | 66% | 6 | 13% | None |
| Listening Comprehension | 108 | 70% | 104 | 61% | 4 | 9% | None |
| Oral Expression | 110 | 75% | 106 | 66% | 4 | 9% | None |

This chart shows regression in all areas of Kelsey's disability. The "gap" column shows the remaining percentage gap between Kelsey's performance and the average child her age to further demonstrate the significance of the disparity. Therefore, after the same IEP, the same instructional methods year after year, and a good deal of hard work, Kelsey fell further behind her peers, despite her promising intellectual potential.

Similarly, Kelsey has failed to make meaningful progress behaviorally under the IEPs offered by the District. She had several serious disciplinary problems during her fifth grade year, however, the same BMP was offered in August 2000 for her sixth grade year. Her teachers attested to her struggles in their summer camp evaluations and Kelsey's disciplinary problems are documented in the behavioral incident reports. Dr. Morales-Brand's psychiatric evaluation of

Kelsey showed that Kelsey perceived school as a hostile environment, did not have friends there, and translated her academic problems into inappropriate behavioral displays.

Contradicting documentary evidence, Defendant asserts that it "took careful measures to accurately assess Kelsey's educational progress" and points to reading speed analyses in support of this claim. (Doc. No. 13 at 11). Defendant seems to base Kelsey's progress almost entirely on her reading speed without reference to whether the assessment measures utilized by the District were incorporated into her IEPs or whether the educational goals set out therein were ever met. In fact, one of Kelsey's initial evaluations at Janus states that she read passages very quickly, even when she was not comprehending the passage or even reading it accurately. Perhaps the District's over-emphasis on speed of reading was to the detriment of accuracy and learning. Defendant points to Kelsey's progress in math and science as support for its argument that the IEP was appropriate, ignoring the fact that these areas were not ever subjects of Kelsey's learning disabilities and not covered by previous IEPs. In fact, as her underlying reading and writing problems failed to improve and the gap widened between her performance and her grade level, it is reasonable to assume that these areas would become increasingly affected.

Despite failure to progress year after year, the District did not revise the January 2000 IEP, but offered Kelsey essentially the same IEP four times. The current IEP was not revised to account for the lack of progress or even to include the most recent information reported in the November 1999 CER. For instance, the CER recommends a "structured, intensive approach" to assist Kelsey in developing reading and writing skills, however, such an approach was never instigated. (See Pl. Hearing Ex. 4). Furthermore, the District did not perform any diagnostic evaluations of Kelsey's educational level or progress at the end of the fifth grade despite her near-

failing grades and increasing behavioral incidents, but merely offered the same IEP to the parents in August of 2000.  The only way in which Kelsey's current IEP was changed from the May 1999 IEP was to increase benchmarks (e.g. 100% compliance in behavioral goals, sounding out words correctly 98% of the time) and to include a BMP added in August 1999 at the parents' request. As another example of a flaw in the evaluation process, the BMP was added before the FBA was conducted and was not subsequently revised, despite the fact that the whole purpose of the FBA was to assess Kelsey's behavioral issues.  Furthermore, the BMP's goals, as noted by the Hearing Officer, seem "impossibly stringent" and not reasonably calculated to provide Kelsey any educational benefit.   (See Hearing Officer decision at 34 (noting that with "what are likely impossible goals and with unspecific interventions, progress would be ephemeral")).

It is difficult to understand how the District could measure Kelsey's progress if it did not consistently take the same tests or at least compare the various tests for the parents or report the scores in a consistent or comprehensible way.  One time when the District did offer the same test for a second time, it was given too soon after the first tests for the results to be considered valid. As another example, the word attack subtest was not administered when the Woodcock Reading Mastery Tests were given for the second time, despite it being Kelsey's weakest subtest in the first administration.  Not only did the District not adequately test Kelsey, it did not adequately report her test scores, or did so without proper explanation, and did not report them at all in the current IEP.  Often, only grade equivalents were reported, even though as Ms. Harbst recognized, such use is inappropriate as they provide only "ballpark" figures.  (N.T. vol. I at 61).  The Appeals Panel has previously held that the use of grade equivalencies should not be used to measure progress and has been condemned by major professional educational organizations.  (See

Hearing Officer decision at 29, citing <u>In re Mary A.</u>, Pa. Spec. Educ. Appeal Panel Op. 867 at 9-10 (Jan. 10, 1999)).

As another example, the IEP Team did not report or take into account the Stanford Achievement Tests, which showed below average performance in reading in writing.  While a FBA was conducted, the current IEP evidences no trace of the results.  Because the IEP is almost identical to the previous IEPs, it is hard to fathom how it could have taken the CER into account at all.  The IEP here never asked whether the annual goals were being met as required by the IDEA– if it had, the question would have to be answered in the negative.  It does appear, however, that the goals were being measured through grade charts and fluency charts, although the fluency charts do not demonstrate comprehension.  (<u>See</u> Def. Hearing Exs. U-X & CC).  As noted by the Hearing Officer, it is significant that the District recognized Kelsey's artistic strengths repeatedly but never utilized them in developing her IEP or inducing her to learn or develop positive self-esteem.  (Hearing Officer decision at 38).  These examples are simply some of the deficiencies in the current IEP that demonstrate its overall failure.

Taking the above academic progress analysis, the Officer's conclusions as to the District witnesses credibility (and the documentary evidence that supports his conclusion), and the procedural problems discussed above, this Court finds that Kelsey did not make appropriate progress, this was not accounted for in the revised IEP, and the IEP is without reference to her widening learning gap, her potential, and her most recent evaluations.   Furthermore, the preponderance of the evidence shows substantive failings in the IEP beyond the lack of progress. In short, Defendant has not met its burden in demonstrating that it offered Kelsey a free appropriate public education and it was error for the Panel to conclude otherwise.

**B.**    *Tuition Reimbursement*

Once it is determined that Kelsey was not offered a free appropriate public education, the burden shifts to the parents to prove that the private placement is appropriate.  Scott P., 62 F.3d at 533.  Reimbursement for private school placement is provided for in the IDEA at 20 U.S.C. § 1412(a)(10)(C)(ii).[12]   The private placement is not subject to the IDEA's free appropriate public education or IEP provisions.  Carter, 510 U.S. at 13.  Moreover, reimbursement is not contingent on the school being on the state's list of approved private schools or meeting the state's licensure or educational requirements.  Id. at 14.  The Third Circuit has held that when the public school fails to provide an appropriate IEP, tuition reimbursement may be made to students placed in private schools that specialize in educating students with learning disabilities.  Ridgewood, 172 F.3d at 249.  Also, like the public school placement, the private placement must be reasonably calculated to enable the child to receive meaningful educational benefit at the time of the placement.  Warren G., 190 F.3d at 83; see also Ridgewood, 172 F.3d at 249, n.8 (noting that the standard for appropriateness is the same for private placement and public placement, meaning "parents of a disabled student need not seek out the perfect private placement in order to satisfy IDEA").

The Appeals Panel concluded that the District did provide Kelsey with an appropriate IEP, but continued with the analysis and found that Janus was not an appropriate placement.  (Panel

---

[12]The statute provides: "If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment."  20 U.S.C. § 1412(a)(10)(C)(ii).

decision at 5).  The Panel noted four reasons for this determination, which Defendant argues this Court should adopt.  They are:  (1) Janus is not licensed for emotional support; (2) Kelsey's reading teacher at Janus is not formally trained in phonetic reading techniques; (3) the reading teacher was not aware of Kelsey's reading level or language arts baseline; and (4) another Janus teacher was not certified in special education.  Id. at 5-6.  Plaintiffs argue that these findings are clearly erroneous.  More specifically, they claim that the Panel used the wrong standard and did not address the suitability of Janus for Kelsey's specific problems.

Certification and licensing is not relevant to this determination and the Third Circuit has previously held Janus to be an appropriate placement for a student with a learning disability. Warren G., 190 F.3d at 83.  Therefore, whatever weight the Panel gave those considerations was misplaced.  It is further irrelevant that Janus is not licensed for emotional support since that has not been identified as one of Kelsey's needs.  She does need behavioral support, but that is vastly different; moreover, her behavioral problems stem from her academic frustrations, which Janus can address.  It is also worth noting that the Hearing Officer placed weight on the fact that two psycho-educational evaluators found that Janus was an appropriate placement  for Kelsey. (Hearing Officer decision at 41).  The placement is anticipated to and devoted to addressing Kelsey's learning disabilities.  Janus offers Kelsey closely evaluated, narrowly tailored curriculum designed to assist her in her areas of disability.  It includes measurable objectives to monitor her progress and behavioral and social training lacking in the District's plan.  The weight of the evidence demonstrates that Kelsey was offered an education at Janus that was calculated to give her meaningful educational benefit.  Therefore, the Panel erred in concluding that Janus was not an appropriate placement and Plaintiffs are entitled to reimbursement for the reasonable cost of

placement at Janus.

Defendant argues that tuition reimbursement should be denied or reduced pursuant to 20 U.S.C. § 1412(a)(10)(C)(iii) because it claims the parents did not object to the IEP and did not give ten days notice of their unilateral placement but "kept their intention secret." (Def. Br. at 17-18). The Court rejects this contention since the record belies Defendant's claims. The documentary evidence demonstrates that notice was given, the District was aware of the parent's displeasure with the IEP, and the District's own evaluation noted that the parents "have expressed a desire to look into alternative educational placement options for Kelsey." (Pl. Hearing Ex. 11 at 1). Even if Kelsey's parents did not comply with the statute in every respect, the statute cited by Defendant gives the Court discretion to reduce or deny tuition reimbursement and does not mandate it. See 20 U.S.C. § 1412(a)(10)(C)(iii). Furthermore, there was nothing unreasonable in the parent's actions that would warrant reduction in the award. Equitable considerations weigh in favor of tuition reimbursement.

### C.    *IEE Reimbursement*

"A parent has the right to an independent educational evaluation at public expense if the parent disagrees with an evaluation obtained by the public agency." 34 CFR § 300.502(b)(1); see also 20 U.S.C. § 1415(b)(1) (requiring states to establish procedures under the IDEA, including "an opportunity for the parents of a child with a disability . . . to obtain an independent educational evaluation of the child"). Defendant argues that the standard for reimbursement for such evaluations is that applied by the Appeals Panel, whether private evaluations "answers questions not previously answered or provides essential information not previously known to district personnel." (Def. Br. at 18-19; Panel decision at 6). However, the district court cases

cited by Defendant do not cite this standard.   Even if this were to be the standard applied to this case, the IEE at issue would meet it since it did provide information not known to the District.  In any case, this Court rejects the standard cited by Defendant as not compatible with the clear statutory language and Third Circuit caselaw.

"Pennsylvania regulations allow parents to be reimbursed for a private evaluation of a disabled student if that evaluation was sought as a result of the parent's disagreement with the school's [evaluation], and if the evaluation then demonstrates that the school's [evaluation] was in some way inappropriate."  Holmes v. Millcreek Township Sch. Dist., 205 F.3d 583, 590 (3d Cir. 2000); see also Warren G., 190 F.3d at 87 ("the object of parents' obtaining their own evaluation is to determine whether grounds exist to challenge the District's").

Here, the IEE highlighted the shortcomings of Defendant's evaluation and IEP.  The IEE provided a wealth of useful information, including detailed recommendations tailored to Kelsey's specific needs.  Babcock offered specific strategies for approaching and accommodating Kelsey's academic and behavioral needs for both her parents and her teachers.  Importantly, his thorough use of aptitude and achievement test demonstrated the failings of the District's testing practices.  For instance, he offered the WIAT, the test that Kelsey had initially been evaluated with, and the results of that test showed Kelsey's lack of progress over her years in special education.  Because this Court has found the District's evaluation to be inappropriate and because the Babcock evaluation further demonstrated this inappropriateness, Kelsey's parents are entitled to reimbursement for the costs of the evaluation.

IV.    **Conclusion**

For all of the reasons discussed above, this Court holds that the District did not offer

41

Kelsey a free appropriate public education for the 2000-2001 school year.  Her IEP was wrought with procedural and substantive deficiencies.  The Appeals Panel improperly applied the FAPE standard and departed from the Hearing Officer's credibility determination without providing the requisite justification.  This Court further holds that Janus was an appropriate placement for Kelsey and that the Panel used improper considerations in concluding otherwise.  Plaintiffs shall be reimbursed the reasonable costs of tuition at Janus and transportation.   Likewise, this Court finds that the IEE of Alan Babcock was appropriate to account for the inadequacies of the District's evaluation and holds that Plaintiffs are entitled to reimbursement for the IEE.  Finally, this Court will exercise its discretion in awarding Plaintiffs attorney's fees since they are the prevailing party on all claims.  An appropriate order follows.

## ORDER

**AND NOW**, this 7th day of May, 2003, upon consideration of the parties' motions for

summary judgment and all responses thereto, for the reasons stated herein, **IT IS HEREBY**

**ORDERED THAT**:

1.  Plaintiffs' motion for summary judgment or decision on the administrative record (Doc. No. 12) is **GRANTED**.  This Court **REVERSES** the decision of the Appeals Panel in its entirety.

2.  Defendant's motion for summary judgment or decision on the administrative record (Doc. No. 13) is **DENIED**.

3.  Judgment shall be entered for Plaintiffs and against Defendant on all claims. Defendant shall reimburse Plaintiffs for tuition and reasonable transportation costs for placement of Kelsey at the Janus School for the 2000-2001 school year, $20,620 for tuition and $179 per month for transportation.  Defendants shall also reimburse Plaintiffs for the actual cost of the IEE of Dr. Alan Babcock.

4.  Defendants are further liable to Plaintiffs as prevailing parties for reasonable attorney's fees and costs pursuant to 20 U.S.C. § 1415(i)(3).  Plaintiffs may file a motion for attorney's fees and a supporting brief within thirty (30) days of the date of this Order.

5.  The Clerk of Court shall close the file.

  s/ Yvette Kane
Yvette Kane
United States District Judge